RAILROAD COMMISSION OF TEXAS v. HOUSTON & TEXAS CENTRAL RAILROAD COMPANY.

Decided April 28, 1897.

**1. Railroad Commission—Interstate Commerce.**

The order of the Railroad Commission, June 21, 1895, regulating the compressing of cotton shipped by rail, was not intended to apply to interstate shipments, and is not invalid as being an attempt to regulate such commerce.

**2. Railroad Commission—Reasonable Regulations—Questions of Law.**

The facts by which the reasonableness of regulations adopted by the Railroad Commission are to be determined are to be ascertained by the jury or court trying the case, but whether the regulations are reasonable or not is a question of law.

**3. Same—Deductions from Facts—Power of Appellate Court.**

The appellate court is not bound by the deduction drawn from the facts by the trial court that such regulations are unreasonable, but will determine the effect to be given them, and, if its conclusion differs from that of the court below, will reverse and render.

**4. Same—Compressing Cotton—Regulations Sustained.**

The regulations for compressing cotton in transit on railroads, adopted by the Railroad Commission June 21, 1895, as applied to the facts ascertained in the present case (for which facts see opinion), were not unreasonable.

**5. Same—Public Interest.**

See opinion for facts from which a conclusion of the trial court that no public interest would be subserved by the enforcement of such regulations was held not a proper deduction.

**6. Same—Finding Unsupported.**

A finding that as much cotton can be transported on a car when uncompressed as. when compressed, supported by evidence apparently mere opinion, and opposed to physical laws, rules of common experience, and general knowledge possessed by men of ordinary intelligence when applied to the undisputed facts, held not binding on the appellate court.

**7. Railroad Commission—Discretion—Review by Court.**

The Railroad Commission having authority to regulate the subject of compressing. cotton in transit, the exercise of its discretion therein could not be set aside or pronounced unreasonable because a court found that the points selected and rules. adopted for compressing were not the best nor such as the court would have selected.

**8. Same—Reasonable Regulations—Burden of Proof.**

The burden thrown upon the complainant by the law of proving the regulations. unjust and unreasonable, is not met by showing that better rules could have been made, or that the rules do not work as advantageously as if no rules had been adopted.

ON MOTION FOR REHEARING.

**9. Transporting Cotton—Compressing—Sufficiency of Evidence.**

The testimony in this case set forth, and held not to show that as much cotton could be carried upon flat cars uncompressed as compressed, but the contrary.

**10. Same.**

Though the evidence were held to show that the same amount of uncompressed as of compressed cotton could be carried on flat cars, this would not warrant setting, aside a regulation of the Commission requiring the compressing of cotton, when from 15 to 25 per cent was carried in box cars, the capacity of which was greatly increased by compressing.

APPEAL from Travis. Tried below before Hon. F. G. MORRIS.

The regulations adopted by the Railroad Commission and governing the compressing of cotton in transit are given in full in the opinion of the Supreme Court upon questions certified in this case, where the authority of the Commission to make and enforce regulations on that subject was sustained. Railroad Commission v. Railway, 90 Texas, 345-347.

*M. M. Crane,* Attorney-General, and *J. L. Harris,* for appellant.

*Frank Andrews* and *Baker, Botts, Baker & Lovett,* for appellee.

FISHER, CHIEF JUSTICE.—This suit was instituted in the court below by appellee, the Houston & Texas Central Railroad Company, on October

31, 1895, against the Railroad Commission of Texas, under the provisions of the act, approved April 3, 1891, providing for the creation of a Railroad Commission, for the purpose of having declared unreasonable, unfair, and unjust the rules and regulations established by said Commission in reference to the compression and concentration of cotton, as shown by a copy of such rules and regulations set forth in plaintiff's petition, and praying judgment canceling, annulling, and setting aside said rules and regulations in so far as the same applied to appellee, and perpetually enjoining the Railroad Commission of Texas from enforcing the same. The grounds of the action were, in effect: first, that the Railroad Commission of Texas was without power and authority, under the law, to establish the rules and regulations in question; second, that the rules and regulations were unreasonable, unfair, and unjust in their application to the plaintiff; and third, that the Railroad Commission was applying and seeking to enforce the application of such rules and regulations to the transportation of cotton from points within the State of Texas to points in other States and in foreign countries—interstate and foreign commerce. The grounds of the action were set out in detail in the plaintiff's original petition.

The defendant answered in due time by general and special exceptions, by pleading the general issue, and by special pleas which need not be stated here.

The case was tried before the court without a jury, and resulted in a judgment in favor of the plaintiff, granting the relief prayed for in plaintiff's original petition.

The first grounds urged in the attack upon the rules and regulations complained of were disposed of in an opinion by the Supreme Court adversely to the contention of appellee. We certified to the Supreme Court the question whether the Commission had the authority to make and promulgate the rules in question, and that court held that such power existed. Reference is made to the opinion of the court upon that question, and as the rules complained of are there fully stated we deem it unnecessary to set them out here, except to state that they, in effect, require railway companies transporting cotton, upon request of the shipper, to have it compressed at the initial point or at the nearest compress thereto on the line of route.

There is no force in the third objection urged to the rules, as it evidently was not the purpose that they should apply to interstate shipments, nor do the facts in the record show that any effort was made to give them such an application. The first finding of fact of the court below is against the appellee on this question, and such being the case we do not feel called upon to decide the question whether the Commission can apply its rules and regulations concerning the compression of cotton to interstate shipments.

The only question that remains for us to decide is that raised in the second objection to the rules and regulations—that is, whether they are unreasonable and unjust when applied to the line of road operated by appellee.

The court below filed conclusions of fact, which need not be fully repeated by us. From these facts the court concluded that the rules and regulations of the Commission concerning the compression of cotton were unjust and unreasonable when applied to the appellee.

The correctness of some of these findings is seriously questioned by appellant, and in view of the facts stated in the record, and of physical facts known to all men, we must differ with the court in some of its conclusions.

At the outset, before discussing the effect of the facts and the conclusions of the trial court, we desire to state what we understand to be a rule of law which should be observed in determining if these rules and regulations are reasonable or unreasonable, and which will partially control us in reaching a final conclusion and disposition of this case. This rule is that the determination of the question whether the rules and regulations are reasonable or not is a matter confided to the court as a question of law. The facts upon which the regulations are based and that surround it must be ascertained by the court or jury trying the case, but the effect of the facts in determining the character of the rules are questions for the court.

In the case of the City of Austin v. Cemetery Association, 87 Texas, 338, in passing upon an ordinance of the city, the court said: "But whether the facts relied upon show the ordinance to be unreasonable or not is a question for the court."

The same rule, we think, should apply to the rules and regulations promulgated by the Commission. The power to make rules concerning subjects confided to it is as broad as that of a municipal corporation to pass resolutions and ordinances. Each alike affects and serves some public purpose and interest. Both act in a quasi legislative capacity, with additional functions resting upon the Commission partly judicial in character. Hence the reasons for the rule that places upon the court the duty to determine as a matter of law if an ordinance is or not reasonable should be applied in ascertaining a like question when the rules and regulations of the Commission are up for construction. In view of this principle, in determining the effect of the rules and regulations, we should consider all of the facts in the record, and give them such effect as they may be entitled to. This is not a case in which this court is undertaking to decide between conflicting evidence or to determine the credibility of certain testimony, and thereby usurping the province of the trial court to find the facts; but it is one in which this court feels authorized to differ with the trial court as to the effect to be given to certain facts found in the record, when considering all of the facts in their entire range bearing upon issues involved in the case. We do not undertake to reconcile a conflict in the evidence upon disputed points, but we claim, in a case of this character, the privilege of determining the effect to be given to all of the facts; and considering the facts in their strongest light favorable to the railway company, we may claim, as we will endeavor to show, that they do not warrant the effect given to them by the trial court. In other words, to simplify the proposition, we do not feel that we are bound by the findings or construction placed upon the facts by the trial court, as

his findings, in effect, are simply deductions drawn from all of the facts. Whether the rules are reasonable or unreasonable depends upon what effect a court will give to all of the facts bearing upon that question, and in the exercise of this function our jurisdiction equals that of the court below. Consequently, we are at liberty to ascertain the effect to be given to the facts and what they establish.

This much is said in view of the disposition we make of the case in reversing the judgment of the court below and rendering judgment in favor of appellant, as at one time we entertained a doubt, in reversing the case, as to the power of this court to go so far as to render a judgment differently from that rendered by the court below.

The court below found that the compresses along the line of appellee's road in the interior are able with due promptness to compress cotton to the density required by the Commission rules, and that these compresses afford reasonable protection from fire. We adopt this finding as correct, and also find that the cost and expense of unloading and loading cotton at the compress points on the line of road are borne by the compresses, without charge to the shipper or railway company. We also find that much more cotton can be loaded upon cars for transportation when compressed than would be the case if not compressed, as the compression of cotton to the density of $22\frac{1}{2}$ pounds per cubic foot, as required by the Commission rules, reduces its bulk nearly one-half.

The benefits to result in compressing cotton at the initial point of shipment, or the nearest compress reached after leaving, as required by the Commission rules, we find to be in reducing the bulk of the shipment, thereby placing the cotton in a condition to be transported with fewer cars and fewer trains, and with fewer hands or crews to operate them, thereby to some extent decreasing the expense to the railway company in transporting the cotton to market, with the further effect of leaving to the railway company, for its use and for the benefit of the public, more surplus cars and rolling stock that may be serviceable in the general traffic of the road. The compression of cotton is beneficial to the public in many ways, notably in that, in reducing its bulk nearly one-half, it can be more expeditiously transported to market and more readily handled. And as a fact we can conclude that the rules requiring compression at compresses nearest point of shipment will so distribute the cotton at compresses along the lines of road as will prevent blockades, and will sooner cause its compression than would be the case if hauled to Houston and Galveston for compressing, for the time required in making the haul to those points could be devoted, in many cases, to compressing cotton, if immediately delivered by the railway company to the nearest compress after receiving it.

We also find that in order for the railway company to comply with the Commission rules it will be put to some inconvenience and delay in switching cars and placing them at the compress at points on the line of its road where they have no switch crews, and that this will be attended with some extra expense to the railway company, greater than would be the case if they were allowed to transport the cotton directly to Houston for com-

pression; and that at some of these compress points they have no regular switching crews stationed, but at some of the compress points on the line they have switch crews, and at such places this delay and extra expense will not occur.

We also find that the compresses at Houston, where the railway company usually delivers most of its cotton hauled from interior points for compression, are able usually to compress the cotton transported over the appellee's road, and are able to compress cotton to an equal or greater density than required by the Commission rules, and that the railway company have better facilities there for handling cotton than at some interior compress points on its line of road, and can handle the cotton to be compressed there possibly cheaper than at points on the line of its road where it has no switching crews.

These findings are in some essential features different from those found by the trial court. That court, in effect, found that no public interest would be subserved from an enforcement of the rules and regulations requiring the road to deliver cotton for compression to the compresses on its line, and also found that as much cotton when uncompressed could be transported on flat cars as when compressed.

It should not require argument to demonstrate that much benefit results from the compression of cotton to a density that practically reduces its bulk one-half, and we do not desire, upon this point, to add anything to what has been said in our findings of fact.

The finding that as much cotton when uncompressed can be transported on a car as when compressed is clearly opposed to physical laws, and all rules of common experience, and general knowledge that is supposed to be possessed by all men of ordinary intelligence. If the compression of the cotton reduces its bulk one-half, the space for it to occupy upon the car will be reduced in a like proportion; hence it logically follows that more bales when compressed can be loaded on a car than when not compressed. It is not contended by anyone that an ordinary car can not bear and support a weight much greater than that of a carload of uncompressed cotton; but from the facts we can well assume that a car will support all of the weight of any number of bales, whether compressed or not, that can with safety to their equilibrium be placed upon it.

The court in some of its finding of fact points out what it conceives to be certain benefits to shippers and cotton buyers if the railroad could transport cotton unhampered by the Commission rules and have it compressed at points selected by the road. This much of the findings are simply deductions from the facts, and are more in the nature of an argument or theory than properly the ascertainment of facts. And further, they need not be considered in determining if the rules and regulations are unjust and unreasonable to appellee, as they have little, if any, relevancy to that question.

There are other findings by the trial court, to the effect that the compression of cotton at Houston, where the railway was having most of it done, was more beneficial to the shipping public than if compressed at the places on the line of road as required by the Commission rules, and

that this was done with less cost and expense and inconvenience to the railway company. The fact is, this was evidently the main ground upon which the court below reached its conclusion that it would be unreasonable and unjust to appellee to enforce against it the rules and regulations in question.

Since the decision of the Supreme Court holding that the Commission had the authority to make rules and regulations requiring cotton to be compressed at the nearest compress points on the line of road after being received by the railway company, and in view of the undeniable proposition that the compression of cotton results in much benefit not only to the shipping public but to the carrier, the conclusion must be admitted that the trial court, when it in effect held that cotton could be more advantageously compressed at Houston than at the points required by the rules, and made the invalidity of the rules rest upon this effect, substituted its judgment and opinion upon this point for that of the Commission; and the effect was to declare that the rules promulgated by the Commission were not the best and wisest in the interest of all parties that could have been made upon that subject; that they made the mistake in not selecting Houston as the point for compressing cotton, instead of the interior compresses on the line of road.

The Commission in making the rules and regulations were in the exercise of a jurisdiction over a subject about which it was permitted to exercise some discretion; and if it is admitted that it could require the railway companies to cause the cotton to be compressed, and that some public benefits would result therefrom — which is undeniable — it was clothed with the authority, in the exercise of its discretion, to select places where this service should be performed. The fact that the points selected were not the best under the circumstances, and that the rules were not the wisest that could have been made, are not grounds for setting aside the entire rules and leaving the railway company entirely free of its duty to the public in the compression of cotton. The public duty which must be admitted may be forced upon the carrier in this respect can not be cast off because it is not permitted in its own way, and at places of its own selection, to perform it, or because the authority which may require it to perform this duty has not acted as wisely in the premises as it might have done.

The Supreme Court of Minnesota, in State v. Vandersluis, 42 Minnesota, 131, in passing upon the reasonableness of rules relating to the practice of medicine, says: "The only limit to legislative power in prescribing conditions to the right to practice in a profession is that they should be reasonable. Whether they are reasonable—that is, whether the Legislature has gone beyond the proper limits of its power—the courts must judge. By the term reasonable we do not mean expedient, nor do we mean that the conditions must be such as the court would impose if it were called on to prescribe what should be the conditions. They are to be deemed reasonable when, although perhaps not the wisest and best that might be adopted, they are fit and appropriate to the end in view,

to wit, the protection of the public, and are manifestly adopted in good faith for that purpose."

Now the rules of the Commission are manifestly in the interest of the public, and are such that the Supreme Court have determined they had the power to make, and the fact that others could have been made better adapted to the circumstances and wiser in some respects would not authorize the courts to relieve the railway companies entirely from their operation and to leave the right to have cotton compressed dependent solely upon the wish and will of the carriers; for the effect of such ruling would be to overthrow the doctrine that the Commission has the power to make rules regulating that matter, and would place the railways in a position to escape the effect of the regulations whenever they could show that wiser and better rules could have been made. Vesting this Railroad Commission with the authority to make rules and regulations concerning the compression of cotton was the remedy wisely provided to compel the railway companies to perform a service and duty which, before, they only performed when they desired to do so. The purpose was to remove this matter entirely from the discretion of the railway companies and to require of them the performance of this duty whether they desired to do so or not, subject only to the limitation that the rules and regulations looking to this end must be reasonable and just to the carriers.

The law places upon the railway company the burden of proving that the rules and regulations are unjust and unreasonable when applied to it. And when we keep in view the public interest intended to be subserved by these rules, proof of facts tending to show that better and wiser rules could have been made does not satisfactorily establish the proposition that those in use are unreasonable and unjust. The most that may be said in such a case is that the rules do not operate as advantageously as would have been the case if different rules, or no rules at all, had been adopted. But this alone falls far short of establishing that those in actual operation, for this reason, are inherently unjust and unreasonable. The enforcement of the rules as made and existing will subserve a useful purpose, and because other rules, if made, would serve a better purpose, does not justify the court in holding that for this reason the existing rules are not reasonable, and to bring about a condition that will relieve the railway company from the operation of any rules and regulations concerning this matter.

It is also contended that the railway company should be relieved from the operation of these rules, because to observe them would be at the increased expense and inconvenience to the company, without an equal corresponding benefit to the public.

There would be much force in this contention in tending to establish that the rules and regulations were unjust and unreasonable if an observance of them would occasion a gross or unreasonable disproportion between the benefits to be received by the public and the carrier and the expense and inconvenience to the company. But the facts in the record do not show such to be the case. In the nature of things, it is difficult, in a case of this character, to put a pecuniary value upon the benefits to

result to the public, or to ascertain with accuracy just to what extent will be the value of the benefits received by the public; but, as before said, it can be readily perceived that the compression of cotton results in some benefit to the public as well as to the carrier, but there is no standard by which it may be measured in dollars and cents. And in this respect it is like many duties and services that must be performed by the carrier in the interest of the public, and in which the public interest is admitted, but can not be appreciably measured by any pecuniary standard. Between the benefits received on the one hand and the attendant expenses on the other, there is no general rule of average or equality that will aid us in this class of cases; and all that is required is to ascertain if the public have an appreciable interest in the performance of the service, and whether its cost and expense will be so great and burdensome as to render it unjust that the carrier should bear it. The evidence upon this question, when considered in an aspect most favorable to the appellee, simply establishes that to observe the rules would burden the railway company with an additional expense at compress points where they have no switching crews, and would cause a delay and inconvenience in the movements of its trains. That branch of the evidence which tends to show that the public would be as well served and as much benefited by permitting the railway to carry the cotton to Houston in violation of the rules, and there have it compressed, has been disposed of by what has been previously said upon that question. The evidence does not show that the delay and inconvenience occasioned by sidetracking cars at compress points would seriously embarrass the appellee in the movements of its trains. Nor does it appear that the cost and expense attendant upon that service stands in a disproportionate ratio to the benefits to be received by the company and the public from its performance. It is not shown that the expense in this respect is very much greater than that incurred by the railway company in placing shipments of other commodities in carload lots on sidetracks at stations where destined. There are many services and duties which the railway companies must perform at a cost and expense to them in the interest of the public. And it has never been successfully contended that they are absolved from the duties resting upon them in these respects because their performance is attended with expense. Under the law, when circumstances authorize it, the railway is required to transport freight in carload lots; and it is well known that these cars are delivered to the stations where billed and there sidetracked by the railway company in order to be unloaded, or if not sidetracked, and the company wishes that the car shall remain in the train, the train is there delayed until the car is unloaded. The railroad companies have never urged, nor can they successfully urge, that they should not be required to transport in carload lots because the delay and switching of the car at point of destination or having it unloaded there will result in inconvenience and expense to the company. The interest of the public requires of the railway companies that they shall maintain their tracks and rolling stock in a reasonably safe condition, and that they shall offer to the public adequate and proper facilities for transportation, and they are

required, in the pursuit of diligence and care, to do many other things. All of these duties occasion an expense to the railway companies. Without doing these things and performing these duties the railway companies could possibly operate their roads at a less cost and expense; but in this age it is not seriously contended that the extra cost and expense connected with the observance of these duties and services will excuse the roads from performing them. In the performance of these duties it is difficult to determine the extent of the benefits to result to the public, but in a general way it must be admitted that to some extent it exists, but the difficulty lies in ascertaining the extent of it and measuring it. But the recognition of the existence of some appreciable benefit to result.to the public from the performance of many of these duties removes the only obstacle in the way requiring their performance. The moment it is admitted that the public interest requires the service, the railway company must stand ready to perform it; and the fact that this may occasion a reasonable cost and expense will not relieve the railway from its duty in the premises.

We have not been able to find a case exactly.in point—that is, a case where this identical question was involved—but many cases may be found where municipal ordinances and resolutions have been attacked on the ground that they were unreasonable, and which have been sustained because they served a public purpose. And the facts that the persons who fell within their operation were charged with additional burdens and expense and deprived of some rights and privileges which they had before enjoyed were not obstacles in the way of the enforcement of the ordinances, and were not substantial reasons for holding them unreasonable. Many cases on this line are collated in 17 American and English Encyclopedia of Law, pages 248 to 250. By analogy these cases have some bearing on the question under discussion; for, as previously stated, the application of the rules of construction as to ascertaining if an ordinance is unreasonable should be applied in an effort.to discover the effect of the rules and regulations of the Commission.

For the reasons stated, the judgment of the court below is reversed, and judgment here rendered to the effect that the appellee take nothing by its suit, and that the appellant go hence, and that. the decrees and orders enjoining the appellant from enforcing its rules be vacated and set aside. The cost of this appeal, as well as that of the court below, is taxed against appellee.

The judgment we hereby render is without .prejudice to appellee to pursue any remedy it may have in the future to enjoin the enforcement of the Commission rules if, by reason of subsequent facts, they should become unreasonable or unjust to appellee.

*Reversed and rendered.*

OPINION ON MOTION FOR REHEARING.

FISHER, CHIEF JUSTICE.—The court below found that as much cotton can be transported in flat cars uncompressed as when compressed. In

disposing of this finding, we in our original opinion stated: "The finding that as much cotton when uncompressed can be transported on a car as when compressed is clearly opposed to physical laws, and all rules of common experience, and general knowledge that is supposed to be possessed by all men of ordinary intelligence. If the compression of cotton reduces its bulk one-half, the space for it to occupy upon the car will be reduced in a like proportion; hence it logically follows that more bales when compressed can be loaded on a car than when not compressed. It is not contended by anyone that an ordinary car can not bear and support a weight much greater than that of a carload of uncompressed cotton; but from the facts we can well assume that a car will support all the weight of any number of bales, whether compressed or not, that can with safety to their equilibrium be placed upon it." The appellee attacks this portion of the opinion on the ground that it is not supported by the facts, and also that the facts support the conclusion reached by the trial court. In discussing this question we were dealing with the capacity of flat cars, as the finding of the court which we differed with related to that character of cars. The trial court did not reach any such conclusion as to box cars, and we understand that it is not denied, but is in effect admitted, that as to such cars they will convey much more cotton compressed than when not compressed.

We here set out the evidence of every witness who testified in the case concerning the number of bales that can be loaded on cars and the capacity of the cars, and the average weight of bales of cotton, and the number of pounds box cars and flat cars can carry.

1. C. W. Bein (traffic manager Houston & Texas Central Railway): "My observation is that more compressed cotton can be put into a box car than if the bales were flat or uncompressed. In respect to flat cars, I do not believe that there is any appreciable difference in the amount of flat or compressed cotton which can be loaded. I am satisfied that the proposition stated in the interrogatory that 100 cars of flat cotton could be stopped and compressed en route and then loaded into thirty-three cars, is true."

2. H. A. Jones (General Freight Agent Houston & Texas Central Railway) testified, that the difference in the cost of transporting flat cotton compared with compressed cotton, and the same has to be largely hauled on flat cars, is so small that it does not cut any figure in the economical handling of cotton.

3. J. M. Lee (Engineer and Superintendent Houston and Texas Central Railway): "Flat cars, as well as box cars, are used in the transportation of cotton, and flat cars are used to great advantage. The advantage in the use of flat cars is attributable to their being the cheapest equipment which we have, as well as being capable of carrying very much cotton, about twice as much as can be gotten in a box car. Should compressed cotton be loaded at the initial point into box cars, a large number of bales could be gotten into this class of equipment, and of course the transportation cost would be less than if the cotton was loaded flat into box cars. So far as flat cars are concerned, there can be but little, if any,

difference in the cost, as a flat car will carry as many bales of flat cotton as is safe to place on it of compressed cotton. The difference in the cost of loading a flat car with compressed cotton will be a little in favor of the box car. However, in cases of loading flat and compressed cotton on flat cars, the cost of loading is practically the same, and therefore there could be no more cost in handling one than the other. Our experience has demonstrated that the danger from fire in moving trains of exposed cotton, when properly protected by a sufficient number of box cars between the engine and the cotton, is a minimum; and therefore there is no necessity of using box cars except for the purposes of cover. This being the case, the larger number of bales carried by flat cars more than compensates us for the light increased expense in loading, above what it would cost for box cars. From the above and from other information, I would say that the difference in cost could not possibly be near so great as 10 cents per 100 pounds. Like a great many other transportation problems, the actual difference in cost is surrounded by so many contingencies that it would be impossible to determine accurately."

4. L. A. Daffan (Superintendent Houston & Texas Central Railway): "Last year I think about 85 per cent of the cotton from this division was handled on flat cars; this year, about 75 per cent of it has been handled on flat cars. The advantage of handling it on flat cars as against box cars is, because we can put twice as much uncompressed cotton onto a flat car as we can uncompressed cotton into a box car. For instance, if handled on flat cars, we can not safely reload but little more compressed cotton onto a flat car than was brought in on it in an uncompressed condition. There is practically no difference in loading compressed and uncompressed cotton into cars; it requires no extra switching to do it. It is not true that a compressed bale of cotton occupies but one-third of the space of an uncompressed bale. It is not true that we can handle compressed cotton with one-third of the cars that we handle uncompressed cotton with. It is true that if the cotton is given to us at the point of origin in a compressed condition we would handle it with fewer trains and less cars, but not to the extent of two-thirds less. If all cotton was compressed at the gin before being delivered to us, we could transport it cheaper than we can uncompressed cotton; but to stop it in transit to be compressed, with the delay incident to unloading and reloading, as a matter of fact, makes it a matter of no economy to the railroads. In all instances of this kind the cost is greater as a general rule. Twenty-two to twenty-four bales of uncompressed cotton may be loaded into an ordinary box car, and from forty to fifty bales on a flat car. From forty to fifty bales of compressed cotton may be loaded into an ordinary box car. As to the loading of an ordinary flat car, that depends upon the point of destination, or the point at which the car is to be unloaded. If the flat car goes to Houston, we can load this cotton in what is termed a broad-gauge way, and can safely put on it from fifty-five to sixty-five bales of cotton. If the cotton goes to New Orleans (and a great percentage of our cotton does), it is necessary when loading flat cars to load them in what is termed a 'narrow-gauge' way. When loaded in this manner it is not safe to load to exceed

fifty bales on an ordinary flat car, because of the danger of the cotton falling off the cars while in transit. The necessity for loading in the 'narrow-gauge' way is because of some narrow bridges between Houston and New Orleans."

5. W. M. Read: "Yes, I believe the Railroad Commission requires a density of 22½ pounds; but I have never measured the space and made the calculation to ascertain how many pounds of flat cotton would occupy the same space. Of course, the whole space in a box car could not be taken into consideration, as a good deal of space is lost in a car in either event. My experience is that railroads coming into Houston bring about double the quantity of compressed cotton as compared with flat or uncompressed cotton. A box car usually contains twenty to twenty-two bales of uncompressed cotton, and about forty to forty-five bales of compressed cotton. It will not require three times as many cars or crews to move the cotton crop uncompressed as it would compressed."

7. H. W. Garrow: "It is a fact that the rules require cotton to be compressed to a density of 22½ pounds. Cotton thus compressed will occupy more than one-third of the space that it would if uncompressed. It is not a fact that a box car will hold three times more compressed cotton than uncompressed; it will hold more, but not three times more."

8. George W. Neville (compress man): "I have seen in public print the fact that the compress rules and regulations of the Railroad Commission of Texas do require a minimum density of 22½ pounds to the cubic foot; but I can not say that a bale compressed to this density would occupy only one-third of the space occupied by an uncompressed bale. I have never put this to an actual test by measurement, and I only quote from the loadings we receive from the railroad companies through their manifests, on which we have paid their freight charges, where I find that the average number of uncompressed bales to a box car would probably average twenty bales uncompressed. The loadings from the railroad companies for compressed cotton loaded in box cars show that they contain anywhere from thirty-three to fifty bales to a car, compressed. I will state that this varies, and I would state that an average of about forty-eight bales to a box car would be a pretty good average for the cotton that comes down in a box car. This information we also get from the bills which we pay to the railroad companies."

W. A. Polk: "A car can carry about twice as much cotton compressed as it can carry not compressed."

B. F. Smith: "There is no additional cost to the Houston & Texas Central after the cars are set in to the platform, as the compress loads and unloads said cars of cotton free of charge. The switching charges are not paid to the Houston & Texas Central Railroad, the compress being near their main line, but pay same to the Houston & Texas Central Railroad for the switching of cotton localed in or shipped on through bills of lading, that is stopped here for compressing by the Texas & Pacific Railroad. We do not pay switch charges to the St. Louis & Southwestern Railroad, as they have a sidetrack to the compress, and a switch engine and crew as before stated. In a box car brought in containing twenty

bales of cotton flat, we generally return forty to forty-five bales of cotton compressed; and a box car containing twenty-five bales of flat cotton, we generally return in said car from fifty-five to sixty bales of compressed cotton, and have loaded as much as sixty-five bales of compressed cotton in one box car of similar dimensions. We have loaded in furniture cars from sixty-five to seventy bales of compressed cotton. Our cotton is not all measured before leaving the compress, only measured sufficient to see that we are fully up to the required standard of $22\frac{1}{2}$ pounds to the cubic foot."

J. A. Edson: "More cotton can be loaded in an ordinary box car, after it has been compressed to the density of $22\frac{1}{2}$ pounds to the cubic foot, than could be if loaded in a car flat or uncompressed. A box car that will hold twenty-four bales of flat or uncompressed cotton will hold forty-eight to fifty bales of compressed cotton."

L. J. Polk (General Freight Agent Santa Fe Railway): "In the ordinary box car from forty to fifty bales of cotton compressed to the density of $22\frac{1}{2}$ pounds can be loaded; whereas, in the same car, not exceeding twenty-five or thirty bales of flat cotton can be loaded. I would say therefore that twice as much compressed cotton as flat cotton can be loaded in the ordinary box car. I am familiar with the rules established by the Railroad Commission of Texas covering the compression of cotton for shipment over the railroads. My experience is that the observance of these rules makes it less expensive to haul cotton under them than it would be to utterly disregard them and haul it flat to the ports. My reason for this opinion is that it is cheaper to haul say 500 bales of cotton compressed, out of any compress point, in ten cars than it would be to haul the same number of bales of flat cotton out of the same point in twenty cars. In other words, it is an economy of space, and consequently of the transportation cost. For the same reason, it is cheaper to compress cotton in transit, say at a compress located 100 miles from the point of shipment, than it would be to carry the same cotton through to its destination, say Galveston, 400 miles, flat. Not only is it an economy in space and cost of transportation, but in the cost of handling it at the ports. Should no cotton be compressed at points of shipment or in transit, the result during the busy season would be a blockade of our sidetracks and a complete congestion of business, not only here at Galveston, but all along the line, as the ships will receive no cotton except in a compressed state; and the daily receipts would far exceed the capacity of the presses at the port."

N. F. Knight: "My present occupation is that of superintendent of the cotton compress at Cuero. Have been engaged as superintendent of compresses in Texas for the past four years and a half. Have also been local freight agent for railroads at different stations for a number of years. Have had experience with loading flat cars with compressed and uncompressed cotton. You can put from twenty-five to fifty bales more of compressed cotton on a flat car than of uncompressed cotton, depending on the length of the car. On an average length car fifty bales of flat cotton would be an average load, and you could very easily put seventy-

five or ninety-five bales of compressed cotton on it. I have done so. I had special experience in this line last season. At the Yoakum compress we were running day and night, and the railroad companies made us load cotton on the flat cars during the day, and at night allowed us to load a few box cars. We would put fifty bales of compressed cotton in a box car, and could put in twenty-five bales of flat cotton. Generally the cotton would come to the press flat, in cars containing twenty-five bales."

Cross-examination: "Generally you can put fifty bales of flat cotton on a flat car. Fifty bales will weigh about 25,000 pounds. Most any flat car will carry from forty to sixty thousand pounds. No, I do not think that is an exceptional capacity. I have not lately seen a flat car that can not hold 40,000 pounds. Most of them will hold 60,000. Possibly cars shorter than the average length have a capacity of only from twenty-five to thirty thousand pounds, but I have not seen any of that capacity. Our press at Yoakum has compressed to the density of thirty pounds to the cubic foot."

C. F. Carter: "The compressing of cotton about doubles the capacity of the car. Cotton is generally shipped in hundred bale lots, with fifty bales in one car and fifty in another. This is about double the amount of uncompressed cotton that is put in."

W. B. Newsome: "More compressed cotton can be put in a box car than there can be of flat cotton, but I don't know exactly how much more."

George Thompson: "Ordinarily we load a thirty-four foot car with from fifty to fifty-four bales of compressed cotton on the floor of the car, and if we take time we can load in seventy bales. According to my experience, more than twice as much compressed cotton can be loaded in a car than pressed cotton."

N. P. Anderson (compress man): "I don't know what a train load is; have not had any experience in the railroad business; I suppose about twenty cars, however. If this is correct, I suppose you could carry about 500 bales on one train. The railroads charge $3.25 per bale from Fort Worth to Galveston, which would make the train load come to $1625 freight. I understand that a car can hold double the amount of compressed cotton that it can uncompressed. Then the freight on twenty cars of compressed cotton would be double that amount, or $3250, less 10 cents a bale for compressing. Or, in round numbers, the railroad company would get more than a thousand dollars more for hauling a train of compressed cotton than it would for hauling a train of flat cotton; that is the way the figures show. Yes, the railroads pay the compress charges on the cotton that originates on their lines; and it would not matter where they paid it, whether on one end of the line or the other, if a train of uncompressed cotton were the same as a train of compressed cotton. But for a train of uncompressed cotton they only get $1600 from Fort Worth to Galveston; whereas, if it is compressed, they will get $3200. The same result will be reached from McKinney or Denison, and all along the line of the Central. We have received as much

as fifty bales of flat cotton on a flat car; don't think we ever received more than that. I don't know how many bales of compressed cotton could be loaded on a flat car; I am not familiar with the capacity of cars; I believe the usual capacity of cars is about 40,000 pounds, but as to the capacity of flat cars I don't know. I think the carrying capacity of flat cars is about 40,000 pounds. Fifty bales of cotton will weigh 25,000 pounds. You could not put fifty bales of flat cotton in a box car; but I think you can put more than fifty bales of compressed cotton on a flat car. I never loaded one in my life. I don't know the capacity of flat cars. I had reference to box cars when I said the capacity was 40,000 and upwards."

Henry Burghard (cotton buyer): "Yes, cotton compressed to the density of $22\frac{1}{2}$ pounds to the cubic foot will occupy very much less space in a box car or on a flat car than will uncompressed cotton. I don't know whether they can put in twice as much compressed cotton or not. If they could put twice as much compressed cotton on a car, it would only take half the cars to move the cotton crop of Texas that it would take for flat cotton."

In determining the effect to be given to this evidence, we must keep in view the rule of law which was prominently in the mind of the court in originally disposing of the case. To effect this the plaintiff must show by clear and satisfactory evidence that the rules and regulations are unreasonable and unjust. The only statement in the evidence set out upon which the trial court evidently based its conclusion as to the capacity of flat cars is that of witnesses to the effect, "that a flat car will carry as many bales of flat (uncompressed) cotton as is safe to put on it of compressed cotton." The manner in which this testimony was delivered indicates that it was simply the opinion of the witnesses. They do not state the capacity of the flat cars, their size, or how many pounds they will carry, nor any facts upon which they base that statement. They do not explain what they mean by the term "as it is safe to place on it." Whether it was safe or unsafe to the car or the cotton, and in what particular it would be unsafe, is left to conjecture. But it is more than likely that this is explained by witness Daffan, one of the superintendents of appellee's road, and who states that on account of narrow bridges between Houston and New Orleans, and if the cotton goes to New Orleans—which he states the greater percentage does—it is necessary to load the cotton on flat cars in what is termed the narrow-gauge way, and in loading this way it is not safe to exceed fifty bales; and he says if the cotton goes to Houston they can load in the flat car from fifty-five to sixty-five bales in what is termed the broad-gauge way. He does not say they do load in the broad-gauge way in carrying to Houston, but it is evident that they loaded in the narrow-gauge way, as he had previously stated that a flat car would carry of uncompressed cotton from forty to fifty bales. The narrow bridges between Houston and New Orleans, beyond the road operated by appellee, would not justify it in refusing or failing to exhaust the capacity of its flat cars in loading the broad-gauge way in transporting cotton to Houston and other points within the State.

All of the other witnesses that speak of the number of bales of uncompressed cotton that can be placed on flat cars do not exceed fifty. If the appellee desired to rely upon the fact that flat cars could carry as much cotton uncompressed as compressed as one of the grounds showing that the regulations were unreasonable or unjust, it should have introduced facts demonstrating that proposition, so that it would clearly appear to the court; but upon the contrary it is made to clearly appear by the evidence recited, of those witnesses who state anything about the size of flat cars and the weight they will bear, and about the weight of cotton in bales, that much more cotton when compressed can be carried upon flat cars than when not compressed. Knight and Anderson, the only two witnesses who definitely state what fifty bales of cotton will weigh and what weight a flat car will bear, without contradiction state that fifty bales will weigh 25,000 pounds, and that flat cars will carry 40,000 pounds; and Knight, who is not contradicted, states that the most of such cars will hold 60,000 pounds.

Now, testing the conclusion of the trial court as to the capacity of the flat cars not solely as opposed to common knowledge and experience, but by the evidence in the record, it is clearly shown by the weight and preponderance of the evidence that the court did not reach a correct conclusion. If a flat car which the evidence shows will carry at least 40,000 pounds is only loaded with fifty bales of uncompressed cotton which the facts show to weigh 25,000 pounds, it is clear that the carrying capacity of the cars as to weight is not exhausted by 15,000 pounds, consequently the statement made in our former opinion, to the effect that it was not contended that a car would not support a much greater weight than that of a load of uncompressed cotton, is correct. Especially is this true when in oral argument of the case and in the brief of appellee it was not contended that the expression of witness, to the effect "that a flat car will carry as many bales of flat cotton as is safe to place on it of compressed cotton," was based upon the fact that a load of uncompressed cotton would exhaust the capacity of the car to carry a greater weight. But upon the contrary, as appears on page 8 of appellee's brief, the statement is there made that owing to the "character of the package" as much cotton uncompressed could be transported on flat cars as compressed. But as to the character of the package or the manner in which compressed cotton is shaped having anything to do with the number of bales that may be placed upon a car, the evidence is silent. There is in the record nothing of importance upon that question which would have a tendency to show that the shape of the bale of compressed cotton would prevent or interfere with loading more cotton of that class upon a flat car than cotton not compressed. This view of the case in the light of the evidence clearly convinces us that we were not only correct in opposing the conclusion of the trial court as contrary to physical laws and facts of common knowledge, but that its conclusion is not justified by the facts. If we should be wrong in this, there is another as-

pect of the case which, in our opinion, renders the conclusion of the trial court as to the capacity of flat cars unimportant.

Beyond dispute it is shown that box cars will carry nearly double the quantity of compressed cotton than would be the case if the cotton was uncompressed. The evidence shows that from 75 to 85 per cent of the cotton carried over appellee's road is upon flat cars, leaving the balance to be carried in box cars. It is shown that in the summer of 1895 between six and seven hundred thousand bales of cotton were hauled into Houston by the Houston & Texas Central Railroad. And it may be assumed that that road will carry something like that number of bales each year. From this it seems that 25 to 15 per cent of the cotton carried by this road is a great number of bales, which to reach market are carried in box cars. Now, if the rules were abrogated entirely, cotton carried in that class of cars would not be required to be compressed, consequently the benefit or advantage to result from doubling the quantity of shipment by compressing the cotton would be lost, or to say the least, would be under the control of the railway company, which right they would observe just as it suited them. This is just one of the things that the law and the rules of the Commission intended to prevent. They intended to remove from the railway companies the power to say whether they would or would not observe these duties. As to this great volume of cotton which it was shown was transported in box cars, it was important that the public should have the benefit of the rules relating to its compression. The plaintiff sued to set aside and abrogate the rules in their entirety as affected its line of road, and they did not ask for a partial relief from these rules, consequently it is believed that if the plaintiff has not made a case that would authorize it to have the rules entirely set aside they should not be disturbed. If the capacity of the cars to carry more cotton compressed than uncompressed is to be considered as a fact in sustaining the rules, and the negative of that as a fact tending to show that the rules relating to compression are unreasonable and unjust, then the uncontroverted evidence establishing that much more cotton can be carried in box cars compressed than when not compressed, together with the great quantity of cotton that is shown to be carried in that class of cars, demonstrates that as to these shipments the rules are reasonable, if not unreasonable for other grounds, which in the original opinion we held not to be the case. We do not desire to notice the other questions presented, as we adhere to the rulings made concerning them in the original opinion.

The statement made by the attorneys for appellee on page 6 of their motion for rehearing, to the effect that no witness testified that more cotton could be loaded on a flat car compressed than could be loaded on it uncompressed, is incorrect, and we are satisfied that counsel would not have made that statement if they had recollected the testimony of witness Knight on that subject. If they so desire, we will authorize them to expunge that statement from the record. It is intimated in the motion before us that the language of this court in criticising the conclusion of the trial court, wherein it found that as much cotton uncom-

pressed can be carried on a car as when compressed, might possibly be construed as a reflection upon the intelligence of the learned trial judge. Counsel does not so construe our language, but says in effect that possibly others may place such a construction upon it. We have evidence in an extrajudicial way from other sources that the apprehension of the counsel is possibly correct. We were stating what we understood to be a principle applicable to the case which we regarded as proper to be stated as one of the grounds for overturning the conclusion of the trial court. We were not proposing to attack any evidence which the court below may have believed existed as the basis for its conclusion; because, in our opinion, there was no sufficient evidence upon which to base it. Nor were we attacking any position of counsel upon that question. But the conclusion and finding of the court was the matter to which the assignment of error of the Attorney-General directly invited our attention, and the validity of that conclusion was the issue directly presented. Therefore, believing that that conclusion and finding must fall when assailed by physical laws and rules of common knowledge and experience, it was our duty in the exercise of our judicial functions in deciding this question to so rule. The use of the expression "supposed to be possessed by all men of ordinary intelligence," was simply the statement of what we considered as a necessary component of the principle stated. And our purpose was in no wise to reflect upon the intelligence of the trial judge, for that was a matter that did not concern us, and was not judicially before us.

This much is said not in the nature of an apology, but simply in explanation of our original opinion.

*Motion overruled.*

Writ of error refused.